IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA


Marian S.A. Tipp

     *Plaintiff,*

v                             Civil Action No: 20-CV-317-TFM-N

JPMC Specialty Mortgage, LLC,
JP Morgan CHASE BANK, N.A.,
Chase Home Finance, LLC,

     *Defendants.*


## PLAINTIFF'S  AMENDED VERIFIED  COMPLAINT
## FOR
## DECLARATORY JUDGMENT

————————

COMES NOW, the Plaintiff, Marian S.A. Tipp ("Ms. Tipp"), *successor in title,* to amend her complaint filed on June 30, 2020,  to recover possession of her property known as "11101 Ben Hamilton Road, Grand Bay, Alabama, 36541" and a Declaratory Judgment declaring her the lawful owner of the property.

The property was the subject of ***two*** prior actions between defendant JPMC Specialty Mortgage, LLC ("JPMC") and Ms. Tipp's sister, Carolyn E. Sims, ("Ms. Sims"). Ms. Tipp acquired her title to the property by quit claim deed on August 22, 2009.

## JURISDICTION

A federal district court has original jurisdiction of an action between citizens of different states when the amount in controversy exceeds $75,000.00. 28 U.S.C. § 1332(a).

## THE PARTIES

Ms. Tipp is a citizen and lifelong resident of Mobile County, Alabama and is over the age of 21.

JPMorgan CHASE BANK, N.A., ("CHASE BANK"), is a federally chartered national bank with its home office and principal place of business outside the State of Alabama. In *Rouse v. Wachovia Mortgage, FSB,* No. 12-55278, 2014 WL 1243869 (9th Cir. Mar. 27, 2014), the court held that a national bank is a citizen only of the state in which its main office is located.

JPMC is a Delaware foreign limited liability company that has not complied with this states laws to do business and has no known principal place of business. The Alabama Secretary of State certified on October 9, 2009 that "no record is found to exist for any entity by" the name of "JPMC Specialty Mortgage, LLC." (Exhibit A)

JPMC is a "wholly owned subsidiary" of CHASE BANK that is not licensed by the O.C.C. as a "licensed operating subsidiary." JPMC is not regulated by any federal or state agent – JPMC is a rogue foreign entity.

Chase Home Finance, LLC, ("CHASE"), a Delaware foreign limited liability company, is not qualified to do business in Alabama and has no known principal place of business.

The Alabama Secretary of State certified on October 9, 2009 that "Chase Home Finance, LLC, a Deleware Limited Liability Company, registered in the State of Alabama on May 15, 2006. I further certify that the records do disclose that a certificate of cancellation has been filed with this office on behalf of Chase Home Finance, LLC on August 4, 2008." (Exhibit B)

CHASE is a "wholly owned subsidiary" of CHASE BANK that was not licensed by the O.C.C. as a "licensed operating subsidiary" at the time of the foreclosure of the property on July 13, 2009.

## AUTHORITY FOR ACTION

The property rights of the parties was adjudicated on the merit in *Sims v. JPMC Specialty Mortgage, LLC*, 218 So. 3d 376 Ala: Court of Civil Appeals 2016 where the court found "because Sims conveyed any interest that she had in the property to Tipp via the quitclaim deed, privity existed between Sims and Tipp" and "a judgment that had ascertained the property **rights** of the parties in the earlier action precluded relitigation of those same issues with regard to their *successors in interest."*

Ms. Tipp was not a party to the earlier action, but in *Walden v. Es Capital, LLC, 89 So. 3d 90 - Ala: Supreme Court 2011,* the court held

> "**the parties in this lawsuit are identical to <u>or in privity with the parties</u>** in the Autauga County Suit" despite the fact that neither Crooked Creek nor Edmondson had participated in the prior litigation. …

> *Miller & Miller Constr. Co. v. Madewell*, 920 So.2d 571, 572-73 (Ala.Civ.App.2005).

>> "`**The law-of-the-case doctrine provides that when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the same case**, thereby hastening an end to litigation by foreclosing the possibility of repeatedly litigating an issue already decided."'

> …we see no reason to reconsider this issue in the present appeal. Nor was the Autauga Circuit Court permitted to **reconsider the issue**; in fact, it is well settled that a trial court may not issue an order that is in direct contravention of an opinion of this Court:

>> "`"**A lower court is without power to modify, alter, amend, set aside or in any manner disturb or depart from the judgment of the reviewing court as to any matter decided on appeal …**"'(emp)

In *Tennant v. Chase Home Finance, LLC*, 187 So. 3D 1172 - Ala: Court of Civil Appeals 2015, the court held

> "A trespass to property is a wrong against the right of possession or entry." *Boyce v. Cassese*, 941 So.2d 932, 945 (Ala.2006). In order to be actionable, the entry on the land of another must not be authorized; … Trespass to chattel occurs when "`there is a "wrongful taking and carrying away of the property of another."'" *Wint v. Alabama Eye & Tissue Bank*, 675 So. 2d 383, 385 (Ala. 1996)."

There has been a continuing violation of Ms. Tipp's "right of possession" of her property and in *Breland v. City of Fairhope*, 229 So. 3d 1078 Ala: Supreme Court 2016, the court held there is

> "….[N]o period of limitation at all is applicable to an action for a declaratory judgment … in cases involving a continuing harm … the same constitutes at least **the equivalent of a <u>continuing invasion of plaintiff's property rights akin to a continuing trespass</u>** – a situation in which a new cause of action arises in plaintiff's favor … each day (id. At 254; *see Dowsey v. Village of Kensington*, 257 N.Y. 221, 228, 177 N.E. 427 [1931])."(emp)

## FACTS

1.     The  underlying ejectment action  styled as JPMC Specialty Mortgage, LLC fka WM Specialty Mortgage, LLC ("JPMC")  v. Carolyn E. Sims ("Ms. Sims") Case No. CV-2009-901393 ("the 2009 case") was filed on July 24, 2009, following an "unauthorized" foreclosure sale conducted by JPMC on July 13, 2009.

2.     The property lost in foreclosure by Ms. Sims was the home of her parents, Orester and Bessie Reus Tipp (*aka Ressie and Bessie*), that was deeded to her by her mother, a widow, by Warranty Deed on June 7, 2000 retaining a life interest in the house and 1 acre.

3.      Upon the death of her mother on February 7, 2002, the house and 1 acre was vested in Ms. Sims where she then obtained a mortgage on the property with Ameriquest Mortgage Company on November 13, 2002.

4.     In an attempt to save the home of her parents from foreclosure by default and she could try to recover the right of redemption, Ms. Tipp paid her sister for quit claim deed  to the home of her parents where Ms. Sims conveyed "all the right, title, interest and claim or demand" in property she had already lost in foreclosure and would have lost in default.

5.     Ms. Tipp filed a timely answer and affirmative defenses to JPMC's complaint as attorney-in-fact for Ms. Sims.

6.     After recording the quit claim deed on September 15, 2009, she filed a motion to substitute with an amended answer and affirmative defenses that was granted on September 16, 2009.

7.     In *Douglass v. Jones,* 628 So. 2d 940 – Ala: Court of Civil Appeals 1993, the court held that

> "... it must appear that the plaintiff held title when the suit was commenced and continued to hold title until the time of trial. *Mid-State Homes, Inc. v. Moore,* 460 So.2d 172 (Ala.Civ.App.1984). Such a plaintiff generally cannot recover where he or she fails to show title in himself or herself, regardless of whether the defendant's title is valid. *Mid-State Homes* ... that title to the property was in the executors... title and absolute authority over the property of the estate rested with the co-executors."

8.     By Exhibit C,  Ms. Tipp evidences that JPMC's foreclosure deed attached

thereto as Exhibit "A" indicating it was executed and notarized on July 13, 2009, that "same day" by AMY BARBOUR as attorney-in-fact and auctioneer, **was in fact unexecuted and unrecorded and has never been executed and recorded and legally unenforceable**.

9.      Under prevailing law, "an assignment passes the title to the assignee" (*Ex parte Simpson*, 36 So. 3d 15 – Ala: Supreme Court 2009) and  Ms. Tipp was the legal title holder of record – Ms. Tipp held " title and absolute authority over the property." (*Douglass*)

10.     In *Cadle Co. v. Shabani,* 4 So. 3d 460 - Ala: Supreme Court 2008,  like Cadle,  "... It is clear ... from the record before us that [Cadle]could not prove that it held title ... Because [Cadle] lacked standing to maintain the ejectment action, the trial court lacked subject-matter jurisdiction over this case."

11.     JPMC represented to the court that the mortgage between Ms. Sims and Ameriquest Mortgage Company ("Ameriquest") was "transferred and assigned to WM Specialty Mortgage, LLC" and JPMC Specialty Mortgage, LLC was "f/k/a WM Specialty Mortgage, LLC."

12.     There was no evidence of the  mortgage or an assignment – there was no evidence JPMC was the "real party in interest" in compliance with Rule 17(a).

13.     On September 24, 2009, JPMC filed a Motion to Strike, Motion to Set Aside Order Granting Motion to Substitute Parties, and Objection to Motion to Set Aside Default that was entered by the court in error and reversed, and argued to the court that

> "documents filed by Tipp individually and/or on behalf of Sims are each due to be stricken as they were filed by a nonparty not authorized to practice law in the State of Alabama. This Courts Order granting Tipp's Motion to Substitute was improper and is due to be set aside."

14.     Ms. Tipp got a call on September 25, 2009, that the SPCA had contacted Ms. Sims for the removal of  "abandoned" animals from the property that weren't abandoned. Ms. Tipp spoke with Elizabeth Fotts at the SPCA and JPMC's agent that evening and

> "... he told me that he had been instructed to go out and change the locks on the doors. When he got there, there was animals on the property, and he was instructed to open the door to let the dogs out and open the gate and let the horse out, ... so he called the SPCA ... but he was instructed to open the gate and turn the horse out ... but <u>he was instructed to open the gate and turn the</u>

<u>horse out</u> ...”(Tipp's deposition May 24, 2017 Pg 49-50)

15.     JPMC represented to the court in its 2009 complaint that JPMC “is qualified to do business in Alabama and doing business in Mobile County.” (Exhibit C)

16.     By Exhibit “A” attached hereto, Ms. Tipp admits into evidence that on October 9, 2009, the Alabama Secretary of State certified that “no record is found to exist for any entity by” the name of “JPMC Specialty Mortgage, LLC” and   Section 10-2B-15.02, Ala. Code 1975 provides JPMC's foreclosure sale “shall be held void."

17.     During oral arguments on October 9, 2010, JPMC's attorney

  “... read some emails and referenced emails regarding their agents contacting the SPCA for the removal of  animals, and at that time, Judge Graddick asked if I had copies of it, and he said, no, so [Judge Graddick] told them to give it to me … But George was telling Judge Graddick about it … That their  agents had to contact the SPCA … He told him that there was a hog and a horse on the carport. The horse was in the pasture. It wasn't on the carport … Because he was in his pasture. I mean, he had been there since before my mother passed away … Yeah, he had a stall – a place to get under … I just know that they went to the property and removed the animals … No … **They had already went in and changed the locks on the doors**.” (emp)(Tipp's deposition May 24, 2017 Pg 48-54)

18.     JPMC did not produce those emails as ordered by Judge Graddick and he later compelled production, but JPMC still failed to produce the emails.

19.     By letter dated November 19, 2009,  JPMC's attorney enclosed “a copy of the e-mail from the client discussing the presence of animals on the real property in question” where an email had been copied and pasted from “Zara” on “September 30, 2009 at 10:54 a.m”. instructing “Debbie” to “Please see below message from the agent. The bank did not remove any of the personals or animals

"When I visited the property this morning, The Mobile County Environmental Agency, Humane Society and Animal Control were all there. Several concerned neighbors were in the driveway. They had already removed six dogs before I got there. There was still a house full of cats and kittens. A large hog was in the carport and the horse was still there the carport."...”

20.     Notably, “the bank” failed to acknowledge the SPCA was there after JPMC was instructed to produce those emails.

21.     A “swat team”  orchestrated by JPMC went onto the property without

evidence of authority to foreclose and without legal title whereby JPMC took possession of the property '*beyond the reach of the court'* in September 2009.

22.   Ms. Tipp's title to the property was not subject to the July 13, 2009 foreclosure sale –  JPMC's  July 13, 2009 foreclosure sale was  "held void" by the 'door-closing,' and JPMC's foreclosure deed was **unexecuted and unrecorded and has never been executed and recorded.**

> "Q. Exhibit 4 is the correction deed to the property. Did you prepare that as well? A. I did. Q.  Why did you prepare that document? A. Because the foreclosure deed that was in the complaint wasn't the same one that was in the record. Q. What was different about the two foreclosure deeds? A. The auctioneer and the one that was with the complaint was never executed and recorded. Q. When did you  obtain a copy of the recorded foreclosure deed? A. It wasn't until after I had filed an answer that I found out that it was different. Q. Did you obtain a copy of the recorded foreclosure deed before you prepared this correction deed? A. Yes. Q. Why was the correction deed prepared? A. Because the unrecorded foreclosure deed was the one that was with the complaint. Q. You were correcting it? A. Right. Q. Correcting what? A. The quit claim deed. Q. This correction deed is dated October 15th, 2009, correct? A. Yes. Q. Have you signed anything after that date transferring any rights to the property back to Ms. Sims? A. No." (Tipp's deposition May 24, 2017, Page 23-26 )

23.   During oral arguments on December 4, 2009, Judge Graddick struck all documents filed by Ms. Tipp and then rendered all documents filed by JPMC, other than the complaint  and all orders of the court "moot."

24.   Judge Graddick granted Ms. Tipp 30 days to obtain legal counsel and for an answer to be filed on behalf of Ms. Sims.

25.   On January 4, 2010,  Ms. Sims's attorney filed an answer on her behalf denying the allegations in the complaint and demanding proof, but no counterclaim was filed on her behalf regarding the removal of her animals from the property.

26.   Ms. Tipp's attorney's filed an unopposed motion for leave to file a complaint to intervene and on February 3, 2010, a complaint was filed on her behalf  – JPMC had taken possession of the property and rekeyed the locks without any authority and without legal title.

27.   On February 22, 2010, almost 3 weeks later, JPMC decided to file a motion requesting Judge Graddick to "reconsider its previous order granting Ms. Tipp leave to

file a complaint in intervention and/or to strike Ms. Tipp's complaint in intervention, and in the alternative [JPMC] requests this Court to dismiss Ms. Tipp's claims."

28.   As grounds for it's motion to dismiss,  JPMC asserted  "Ms. Tipp is not a proper party to this case … The true defendant, Carolyn E. Sims, has already filed an answer to [JPMC's] Complaint with the assistance of counsel and is able to defend [JPMC's] ejectment claim against Ms. Sims."

29.   JPMC's foreclosure deed was **unexecuted and unrecorded** and Ms. Tipp was the legal title holder of record with "title and absolute authority over the property" since August 22, 2009, *(see Douglass)* but JPMC argued "Specifically, Ms. Tipp lacks standing to challenge whether [JPMC] had the lawful right to foreclose the mortgage given by Carolyn E. Sims ("Ms. Sims"), the Defendant, and whether the foreclosure was lawful and proper under Alabama Law."

30.   JPMC's motion was  "... one arguing lack of subject matter jurisdiction under Rule 12(b)(1)." (*Taylor v. Paradise Missionary Baptist Church* Ala: Supreme Court 2017."

31.   After the Secretary of State certified JPMC made a known false statement of fact that it was "qualified to do business in Alabama," on February 22, 2010, JPMC argued before Judge Graddick, former Alabama Attorney General, that

> "... [JPMC] has full authority to conduct foreclosures and initiate ejectment proceedings in Alabama. [JPMC] is the subsidiary of JPMorgan Chase Bank,a federally chartered bank. Pursuant to the National Bank Act, 12 U.S.C.A. §1 et seq., Plaintiff had authority to foreclose on Ms. Sims' mortgage and has authority to seek its ejectment action currently before this Court, and this authority preempts state registration and licensing requirements. *See Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 7 (2007)." (emp)

32.   Contrary to JPMC's argument, *Watters* was inapplicable to exempt JPMC from complying with state laws. JPMC is not an OCC "licensed operating subsidiary"[1] of Chase and JPMC is not in the "business of banking." Chase, "a federally chartered bank," is in fact engaging in "non-banking" activity through an uncontrolled rogue entity that is not regulated by any federal agency.

---

1  "… Though state law governs incorporation-related issues, state regulators cannot interfere with the "business of banking" by subjecting national banks or their OCC-licensed operating subsidiaries to multiple audits and surveillance under rival oversight regimes … Wachovia Bank, a national bank, conducts its real estate lending business through Wachovia Mortgage Corporation, a wholly owned, state-chartered entity, licensed as an operating subsidiary by OCC …"

33.    On May 13, 2010, JPMC argued

"Ala. Code § 10-12-52(a) provides that a foreign limited liability company which has been transacting business in Alabama without having registered may maintain any action, suit, or proceeding in any court once it registers in this state. In *CS Assets, LLC v. H & H Real Estate Development, Inc.*, 353 F. Supp. 2D 1187 (N.D. Ala. 2005), the court held that a foreign limited liability company that fails to register is permitted to continue with any action it filed prior to registration so long as the company duly registers prior to a court's determination of a motion to dismiss. Id. At 1189. This being the case, all Plaintiff would need to do to enforce its executed and recorded foreclosure deed on the subject real property against Ms. Sims is to register in this state."(emp)

34.    In *Green Tree Acceptance, Inc. v. Blalock,* 525 So. 2d 1366 Ala: Supreme Court 1988, this court held

"This section of the Code is part of a statutory scheme … foreign corporations cannot circumvent the penal purpose of the statute... Our prior decisions have made it clear that foreign corporations cannot circumvent the penal purpose of the statute. *See Sanjay.*"

35.    In Vermont's Title 11A § 15.02, for "doing business," conforming to Alabama, provides

"A foreign corporation transacting business in this state without a certificate of authority **may not maintain a proceeding" cannot "raise a counterclaim, crossclaim or affirmative defense in any court in this state** …" (emp)

36.    In *Kutka v. Temporaries, Inc.*, 568 F. Supp. 1527 - Dist. Court, SD Texas 1983, a foreign corporation that fails to comply with the laws to do business in the state cannot obtain "...**affirmative relief** in the courts of Texas on any matter arising out of the transaction of intrastate business. This applies as well to a federal district court sitting in diversity. *Waggener Paint Co. v. Paint Distributors, Inc.*, 228 F.2d 111 (5th Cir.1955)." (emp)

37.    In *Green Tree,* the  court held the purpose of the 'door-closing' statute "... is to provide some power for the State to protect Alabama residents from possible abuse by uncontrolled foreign corporations."

38.    There was no evidence of  the mortgage, an assignment of the mortgage, and there was no evidence of a note,  but JPMC then argued on February 22, 2010, that

"On September 25, 2008, the Office of Thrift Supervision ("OTS") seized

Washington Mutual Bank ("WaMu") from Washington Mutual, Inc., and placed it into the receivership of the Federal Deposit Insurance Corporation (the "FDIC"). Pursuant to a Purchase and Assumption Agreement between the FDIC and JPMorgan Chase Bank, National Association ("Chase") on September 25, 2008, the FDIC sold the assets of WaMu to Chase. [JPMC] is a subsidiary of Chase; the subject mortgage was one of the assets purchased by Chase."

39.    JPMC was not a party to the Purchase and Assumption Agreement between CHASE BANK and the FDIC, but on May 13, 2010, JPMC argued that

"... The Agreement serves to explain how [JPMC] came in possession of the subject mortgage absent any assignments which are not already in the record. [JPMC] merely pointed this Court to a public U.S. Government website where the Agreement can be found, and the authenticity of the document is not likely to be called into question. Moreover, [JPMC] could have responded to Ms. Tipp's assertion that there have been additional assignments without "submitting" the Agreement to the Court."

40.    Ms. Sims's attorney had withdrawn and Ms. Tipp's attorney filed an appearance on her behalf and adopted and pleaded Ms. Tipp's response to JPMC's motion to dismiss.

41.    During oral arguments on July 29, 2010, Judge Graddick dismissed Ms. Tipp's complaint and entered an order that same day that the "MOTION TO DISMISS PURSUANT TO RULE 12(B) filed by JPMC SPECIALTY MORTGAGE, LLC is hereby GRANTED."

42.    In *American Credit Co. of Alabama, Inc. v. Bradford*, 414 So. 2d 119 Ala: Court of Civil Appeals 1982, the court held

"The most significant feature of Rule 25(c) is that it does not require that anything be done after an interest has been transferred.  In case of any transfer of interest, the action may be continued by or against the original party the judgment will be binding on his successor in interest even though [s]he is not named. An order of joinder is merely a discretionary determination by the trial court that the transferee's presence would facilitate the conduct of the litigation."

43.    Ms. Tipp was not a "party" to the 2009 case − "No such motion was ever made; consequently, no such substitution or joinder of parties was ordered"  by Judge Graddick.

44.    In *Hayes v. White*, 579 So. 2d 1340 - Ala: Court of Civil Appeals 1990,  where

the court found as here, that it is "clear from the record that <u>the trial court never acquired jurisdiction</u> of this cause and that its ultimate dismissal was proper. Where no cause is lawfully before the trial court, no intervention is possible."

45.     After the dismissal of Ms. Tipp's complaint,  JPMC demanded possession of the property, but Judge Graddick refused – JPMC's ejectment action continued against Ms. Sims, the "true defendant," as requested and pursuant to Rule 25(c)."

46.     In *Sturdivant v. BAC Home Loan Servicing, LP*, 159 So. 3d 47 - Ala: Court of Civil Appeals 2013, the court held that "[i]n *Ex parte BAC Home Loans Servicing, LP*, supra, our supreme court clarified that either possession or legal title is an element of proof to be demonstrated in support of a cause of action for ejectment ..."

47.     JPMC, the plaintiff, had the burden "to prove superior title to the property  ... If the plaintiff fails to do so, the defendant will prevail in the action without the necessity of proving its title in the property. … the plaintiff cannot prevail unless he meets his burden of proof." (*Maiden v. Federal Nat.Mortg. Ass'n,* 86 So. 3d 368 Ala:Court of Civil Appeals 2011)

48.     JPMC "could not prove that it held title" and "lacked standing to maintain the ejectment action, the trial court lacked subject-matter jurisdiction over this case." (*see Cadle*)

49.     On August 27, 2010, JPMC filed a Motion to Dismiss, or in the alternative, Request for Permission to Secure the Property.

50.     In it's motion to dismiss, JPMC asserted to the court that "if this Court determines dismissal of the case is not appropriate, then [JPMC] needs to be able to secure the premises to prevent the further deterioration of the property." (Exhibit J)

51.     Attached to JPMC's motion to dismiss was the Affidavit of Janice Shirah and without any authority whatsoever, she had "visited 11101 Ben Hamilton Rd., Grand Bay, AL 36541,  the real property which is the subject of this lawsuit, on August 25, 2010 for the purpose of conducting an occupancy report, which is attached as "Exhibit A."  As stated in the attached report, the subject real property is vacant."

52.     In the report, Janice Shirah found "[t]his is a one story ranch style home that is <u>vacant.</u> **There are still personal belongings at this location**" – the property needed be to "secured."

53.     JPMC had neither the right of entry or the right of possession through and unexecuted and unrecorded foreclosure deed and on August 30, 2010, Judge Graddick entered an order that "PLAINTIFF'S MOTION TO DISMISS filed by JPMC SPECIALTY MORTGAGE, LLC F/K/A WM SPECIALTY" was granted. (Exhibit K)

54.     In *Williams v. Taylor Seidenbach, Inc.*, 958 F.3d 341, 362 (5th Cir. 2020), the court held "a Rule 41(a) dismissal represents a voluntary abandonment of the entire action, and deprives us of jurisdiction over any element of the dispute. … without-prejudice dismissals are never final or appealable until "final judgment" has been entered."

55.     On September 7, 2010, before Ms. Tipp learned Judge Graddick had dismissed the case,  she  got a call from a neighbor that the front door to her mother's house was open.

56.     Ms. Tipp called the Sheriff's Department and when the deputy arrived, they entered the house and found no one there, but there was a logsheet on the kitchen counter.

57.     After changing the locks in September 2009 and Judge Graddick ordering JPMC produce documents evidencing agents of JPMC were unlawfully entering the property and had taken possession without a court order, and while Ms. Tipp's complaint for trespass was pending before the court, the logsheet evidenced JPMC's agents continued to enter the house and

"Q. There was some discussion about a document that may have been left out of the production today that was a log sheet that you found at the property. Could you just tell me what it is? A. Yeah. It was a notice from Safeguard -- I think it was Safeguard -- that **the property had been winterized, and then on the back side, it was where people had been signing in June, July and August – Q. Of what year? A. 2010.** Q. Sorry. I didn't mean to interrupt. A. -- and **it was CG, which I assume is cut grass and the day that I went out whenever the door was left open, it was on the kitchen counter, and I didn't know that people had been going in and out of the house. So I don't know how long they had been going in and out of the house turning in the log sheet.** Q. And you said you found that log sheet whenever you went to the property on September 9th, 2010? A. Well, that was when I went out and put the posted signs up. I think it was around September 7th. MR. NELSON: Of what year? A. 2010. Q. Why were you at the property on September 7th, 2010? A. That's when I got the call that the door was open, the wrought-iron door was open this way, and

then the door was open inside. So the whole house was open. I don't know how long it had been open. (Tipp's deposition May 24, 2017 Pg 63-65)

58.    In *Adler v. Bank of New York Mellon*, Ala: Court of Civil Appeals 2016, the court held the dismissal on August 30, 2010, rendered the "foreclosure sale invalid, and, consequently, the ... foreclosure deed never validly existed."

59.    Ms. Tipp "held title ... and continued to hold title until the time" the 2009 case was disposed of by Judge Graddick's order of dismissal on August 30, 2010, and has had "title and absolute authority over the property" since August 22, 2009. *(see Douglass)*

60.    JPMC failed to register with the state and voluntarily submitted to the penal effects of the 'door-closing' statute – JPMC's foreclosure sale was "held void" which meant JPMC could never enforce a foreclosure sale on the property.

61.    Ms. Tipp, *successor in title* and legal title holder of record, was the prevailing party in the 2009 ejectment action "without the necessity of proving [her] title in the property" (*see Maiden*)

62.    Defendant's records evidenced that on September 24, 2009, there was instructions to "Close eviction .. Please order assigned services Rekey will be complete within 48 hours Lockbox code will be PAM … We will need a boardup done." (JPMC1611)

63.    Defendant's records evidenced that after taking possession of the property in September 2009,

•    on October 26, 2009, Don Foster completed an Independent Interior BPO on 10/5/2009 with a Repaired Amount  104000.00, As Is 94000.00, 30 day Value 94000.00 (JPMC2425)

•    on October 26, 2009, JPMC noted it had "completed the eviction" (JPMC 2425)

•    on November 3, 2009, JPMC updated its records that the ".... eviction completed date to 11/16/2009 … FU ON EVICTION" (JPMC1790)

•    on November 14, 2009, JPMC updated its records again to reflect the " .... eviction completed date to 11/30/2009 .  ….FU on eviction" (JPMC1785)

64.    By Exhibit H attached hereto, Ms. Tipp admits into evidence that on November 17, 2009, CHASE sent notice to "Precision Asset Management, Inc." canceling the market assignment on the property "due to a change in account status."

65.    By Exhibit I attached hereto, Ms. Tipp admits into evidence that on

November 18, 2009, CHASE sent notice to "Atlas REO" canceling the market assignment on the property "due to a change in account status."

66.    On December 28, 2009, it is noted again that "FC f/u Jan. 4, 2010" (JPMC 1758)

67.    Ms. Tipp, relying upon the laws of this state and Judge Graddick's order of dismissal on August 30, 2010, as a "bona fide" and legally enforceable court order protecting the home of Ms. Tipp's parents from any further actions by JPMC, posted signs on September 9, 2010, to "KEEP OUT" and "NO TRESPASSING:PRIVATE PROPERTY" and  waited for JPMC to make it's next move through the court.

68.    Judge Graddick's order entered on August 30, 2010 was unambiguous – the 2009 case was dismissed without possession or permission to "secure" the property and thereafter signs were posted by Ms. Tipp on September 9, 2010  that were also quite clear – "KEEP OUT" and "NO TRESPASSING:PRIVATE PROPERTY," but defendant's records evidenced the

> "Property inspected on 10/13/2010 and **found to be vacant and secure property** considered to be **<u>vacant but not abandoned</u> due to "<u>No Trespassing" and "Keep Out" signs</u>** which were recently posted at this property ..."

> November 8, 2010, "... this is a post-foreclosure ejectment action. Issues arose when the defendant borrower's sister challenged the foreclosure ... our ejectment case was not needed"

> November 24, 2010, there was a request to "... advise if we should send a 134 letter **and secure the property. <u>Signs are posted on the property to keep out, no trespassing.</u>**"(emp)

> December 1, 2010, Defendant's found the property was "**<u>vacant ready for trash out</u>** no address at street **found vacant house unsecured and <u>visitor log inside</u>** ... **rekey scheduled for tomorrow.**"(emp)

69.    JPMC's affidavit submitted in support of its request for "permission to secure the property" evidenced  "... [t]here is still personal belongings at this location" and on December 2, 2010,  defendant's "rekeyed" the locks, but "if we go to **<u>PP eviction</u>** I believe **we will be on hold for the affidavit issues**" – JPMC cleared that little "issue" right up - "... **<u>We will move forward as a Vacant property</u>** and ... **<u>remove all remaining items left behind</u>**."(emp)

70.     The Warranty Deed from Ms. Tipp's mother to Ms. Sims was for 5.75 acres. After Ms. Tipp evidenced to Judge Graddick the 2 acre lot was not subject to the foreclosure sale, defendant's records evidence on December 10, 2010 that

> "it appears the appraiser left out the most important final numbers on the APN, but there is a legal description addendum included towards the end of the report. He notes the lot is 3 acres, so either he messed up on his figures, or there has been some changes in the lot lines since origination. Janice, we have to base our marketing off of the most current information, so please just send the plat map and tax detail sheet .. to PCV to show the lot at 2 acres."(JPMC1697)

71.     In her quit claim deed and corrected deed, Ms. Tipp did not include the entire 5.75 acres that was described in the Warranty Deed from her mother to Ms. Sims – Ms. Tipp's quit claim deed conveyed the house and 3.75 acres.

72.     Ms. Tipp was in peaceful possession of her parents home after saving it from an unauthorized foreclosure sale not of her doing,   and trips by the house showed the signs she posted on September 9, 2010  were still there.

73.     Ms. Tipp got a call from a neighbor on December 11, 2010 that there were people at her mother's house again, but this time they were there with dumpster's.

74.     Ms. Tipp didn't know if the house had been sold and was being gutted and when she got there, there was a dumpster in the front and one in the back.  Ms. Tipp was told the unauthorized 'trash out'  was courtesy of  "the bank."

75.     Ms. Tipp told the contractor that the house was her parents and she had legal title and legal possession after the banks foreclosure against her sister had been dismissed by the court.

76.     The contractor spoke with Ms. Tipp's attorney on the phone. Ms. Tipp did not know what all was said, but her attorney told her the contractor could not stop the 'trash out' on the property but she could try to  recover what she could as long as she didn't go "dumpster diving" and get in the way of his crew.

77.     The contractor didn't know how old the house was, but told Ms. Tipp he liked 'old houses' and liked her parents house and she told him the house was  erected sometime before 1890.

78.     The contractor said he had inspected it and  found it was structurally sound

and in very good shape and checked underneath the house and found the joist beams were solid.

79.     Before going into the house, Ms. Tipp asked about the python Zeus that could still be in the house and if they had seen it – they had not and he told her "*let's just keep that between us girls.*"

80.     The contents of all the rooms had been disposed of and the crew was in the pantry/kitchen throwing everything out of the cabinets and drawers into wheelbarrow's and wheeling it out the front and back door into dumpster's.

81.     There was a crew of 4 boys that appeared to be having a race to see who could fill the wheelbarrow's and get it out the door into the dumpster's the fastest.

82.     The contractor told Ms. Tipp she could place everything in the corner in the living room and she could come back the next day to get it, but without boxes and working alone with debilitating medical issues, she could barely function.

83.     Ms. Tipp did not have 10 days to remove anything from the house – Ms. Tipp didn't have 10 hours because Judge Graddick never executed a writ of possession or a writ of execution in favor of JPMC.

84.     Defendant's had disposed of everything of Ms. Tipp's parents and some things of her grandparents[2] that remained in their home that she lawfully owned and had legal possession of – personal items that can never be replaced.

85.     JPMC's motion to "voluntarily" dismiss, was yet another *'fraud on the court'* for the sole purpose of "enforcing" an unauthorized foreclosure sale on the property by going *'beyond the reach of the court'* and taking the property by forcible entry and trespass that it could not acquire through the Alabama court system.

86.     Ms. Tipp filed a Declaratory Judgment Action to recover possession of her property on February 9, 2011 styled as Marian Tipp v. J.P. Morgan CHASE BANK, N.A.; JPMC Specialty Mortgage, LLC; Chase Home Finance, LLC; et al., Case No. CV-2011-0139 (the "2011 Case").

87.     There was no joint "stipulation" of the parties – "PLAINTIFF'S MOTION TO

---

        2       Ms. Tipp's father, born March 28, 1901, passed away on March 4, 1983 – his father was born in 1865 and his mother in 1875. Ms. Tipp's mother, born September 7, 1920 – her mother in 1895. Ms. Tipp's mother passed away on February 7, 2002. *'Ressie and Bessie'* were born 19 years apart and passed away 19 years apart.

DISMISS filed by JPMC SPECIALTY MORTGAGE, LLC F/K/A WM SPECIALTY" was granted without possession and without permission to "secure" the property.

88.     Defendant's argued Ms. Tipp's claims were barred by "two key arguments" - she "lacked standing" and her claims were barred by "res judicata" by the dismissal of a non-party complaint to intervene.

89.     In *KLR v. KGS*, 201 So. 3d 1200 - Ala: Court of Civil Appeals 2016, the court held "interlocutory orders become unenforceable upon a final judgment of dismissal"  but Defendant's argued the "dismissal" of  Ms. Tipp's complaint to intervene in a case she was never a party, was a final judgment "on the merit."

90.     In *Gallagher Bassett Servs., Inc. v. Phillips*, 991 So.2d697, 700 (Ala. 2008), the court held the effect of JPMC's "voluntary dismissal without prejudice is to render the proceedings a nullity and leave the parties as if the action had never been brought."

91.     Ms. Tipp was the legal title holder of record in the 2009 case because JPMC's foreclosure deed was **unexecuted and unrecorded** – JPMC "lacked standing to maintain the ejectment action, the trial court lacked subject-matter jurisdiction over this case." (*see Cadle*)

92.     The 2009 case was "a nullity" –  void ab initio without legal effect and  "[a]ll subsequent actions predicated on a void judgment are tainted by the judgment's nullity and are similarly without effect."(*M.G.D. v. L.B.*, 164 So. 3d 606, 613 Ala. Civ. App. 2014)

93.     On October 9, 2009, the Alabama Secretary of State certified that "no record is found to exist for any entity by" the name of "JPMC Specialty Mortgage, LLC" and *Section 10-2B-15.02, Ala. Code 1975 provides JPMC's foreclosure sale "shall be held void."*

94.     In *Sanjay, Inc. v. Duncan Const. Co., Inc*., 445 So. 2d 876 – Ala: Supreme Court 1983 the court held "[t]he bar created by the Constitution and statutes has been upheld when the pleadings and evidence showed that the foreign corporation had failed to comply with this state's laws of qualification."

95.     JPMC's motion for voluntary dismissal was treated as a motion for summary judgment because JPMC attached an affidavit claiming the property was "vacant."

96.     On September 16, 2011,  judgment was entered in favor of an unqualified

foreign corporation, that lacked standing to maintain the 2009 ejectment action that was "dismissed" without possession or permission to secure the property.

97.     The purpose of the 'door-closing' statute "... is to provide some power for the State to protect Alabama residents from possible abuse by uncontrolled foreign corporations" (*Green Tree*) but the Alabama Secretary of State's certification was "ineffective"  to protect Ms. Tipp or her property from an abusive uncontrollable foreign corporation that disposed of the personal property of her parents and took her property by forcible entry and trespass.

98.     JPMC  "acquired that which [it] sought" through the Alabama court system – possession of  the home of Ms. Tipp's parents without meeting its burden of proof in the ejectment action and without application of the penal effects of the 'door-closing' statute in violation of the constitution and laws of this state.

99.     Ms. Tipp was the prevailing party in the 2009 case with legal title and the right of possession.

100.     There was no appealable judgment in favor of JPMC and Ms. Tipp, *successor in title*, was deprived of property without due process of the law.

101.     After Ms. Tipp's claims as *successor in title* were denied and affirmed on appeal, a Declaratory Judgment Action styled as Carolyn E. Sims ("Ms. Sims") v JPMC Specialty Mortgage, LLC ("JPMC") Case No. 02-CV-2013-900439.00 ("the 2013 case") on February 26, 2013.

102.     Ms. Sim's complaint was amended to include claims of forgery against JPMorgan CHASE BANK, N.A.

103.     JPMC argued on April 4, 2013, that "[t]hroughout the 2009 Case, Ms. Tipp held herself out as ... the *successor-in-interest* to the Property" and argued

> "... Bewilderingly, Ms. Sims says that her Complaint against JPMC is based on actions of JPMC after the dismissal of the ejectment action. This is nonsense for two reasons. First, **at the end of the 2009 Case before Judge Graddick, the status of the property was that it was owned by JPMC**, and a final order (see above) had been entered by Judge Graddick dismissing the claims of Ms. Tipp ... The net result is that as of 90 days after the dismissal of the ejectment action it would not be possible for JPMC to commit property torts on its own property." (emp)

104.     JPMC argued in its motion for summary judgment that Ms. Sims's

complaint "... asks that Ms. Sims be declared the lawful owner of the Property, these requests are technically the same, as a declaration that Ms. Sims is the lawful owner of the Property would effectively grant Ms. Tipp title to the Property pursuant to the previously executed Quitclaim Deed."

105.   Ms. Tipp was already the "lawful owner of the Property" – the July 13, 2009 foreclosure sale was unauthorized and no title was conveyed (*see Sturdivant*) and the dismissal of the 2009 case rendered the  "foreclosure sale invalid" and "consequently, the ... foreclosure deed never validly existed," (*see Adler*)

106.   JPMC argued ".... R.CIV. P. 41 governs dismissal of actions. Rule 41(a)(1) was inapplicable to JPMC's dismissal. Rule 41(a)(2) was the only open road and the … trial court followed it..." –

107.   Rule 41 "governs dismissal of actions" but the court found JPMC submitted an affidavit that the property was "vacant" in support of its alternative request for permission to secure the property.

108.   Ms. Tipp's attorney filed an appearance on behalf of Ms. Sims after her attorney withdrew, but the court found Ms. Tipp and Ms. Sims had an "aligned" interest and Ms. Tipp acted as Ms. Sims's virtual "representation" and therefore, Ms. Sims's claims were barred by res judicata by the dismissal of a non-party complaint on July 29, 2010 where JPMC's claims against Ms. Sims were dismissed on August 30, 2010 – a month later.

109.   On September 17, 2015, the court found JPMC and CHASE BANK were entitled to judgment "as a matter of law."

110.   That judgment was reversed on appeal with an opinion in *Sims v. JPMC Specialty Mortgage, LLC*, 218 So. 3d 376 Ala: Court of Civil Appeals 2016 and the court noted that

> "Although the record contains several references to Tipp's "standing," or lack thereof, in the prior actions, we note that the issue whether those arguments would have been more properly framed as questions of real party in interest or other concepts is not before this court. *See generally Ex parte BAC Home Loans Servicing, L.P.,* 159 So.3d 31(Ala.2013) (discussing standing and distinguishing that concept from other concepts).

111.   The court found "[a]lso relevant to this appeal is JPMC's allegation that

"[t]he true defendant, ... Sims, has already filed an [a]nswer ... with the assistance of counsel and is able to defend [JPMC]'s ejectment claim against [her]" – Ms. Tipp was not Ms. Sims's "representative" in any capacity.

112.    JPMC argued in the 2009 case that Ms. Tipp, the legal title holder of record, "lacked standing" to challenge the 2009 foreclosure sale and her complaint was dismissed in July 2010 and JPMC's ejectment action continued against Ms. Sims and  was dismissed in August 2010, but the court found

> "JPMC and Chase assert that there is no genuine issue of material fact regarding whether the circuit court's dismissal of Tipp's complaint in 2009 action adjudicated the question of JPMC's legal authority to foreclose upon the property. However, when viewed in a light most favorable to Sims, the record does not support that assertion, which is inconsistent with the position taken by JPMC in the 2009 action and the 2011 action because it sought relief in those actions, at least in part, based on its repeated contention that the validity of its foreclosure upon the property was not being litigated in those actions."

113.    JPMC did not produce the mortgage, an assignment or the note in the 2009 case, and in *Sims* the court found Ms. Sims's "claims against Chase in the [2013 action] are based upon Chase having placed a forged endorsement on the purported original of Sims'[s] promissory note two and one-half years after the foreclosure sale. The matter of forgery only came to light in late 2013 when Sims was finally able 387*387 to obtain discovery from [JPMC and Chase] ...."

114.    Ms. Tipp's claims in 2011 were barred after defendant's argued her claims to recover possession of her property were "same claims" that were "dismissed" in the 2009 case, but in *Sims,*

> "We note that Sims's allegations of forgery and the other claims against JPMC and Chase that she added in her amended complaint **do not, on their face, appear to be analogous to the claims asserted by Tipp in the 2009 action**. Furthermore, **those claims appear to involve actions that JPMC and Chase allegedly committed after the 2009 action was disposed of**. Therefore, it is not apparent from the record that the merits of those claims could have been adjudicated in the 2009 action."(emp)

115.    JPMC had no legal title and Judge Graddick repeatedly denied JPMC's demands for possession of the property and specifically did not grant JPMC "permission to secure the property" or possession of the property in an unappealable order, but the

court found JPMC argued those claims

> "... could not have accrued after the 2009 action because, **after the circuit court had granted its motions to dismiss** ... its complaint against Sims, it owned the property and, therefore, its actions on the property after that time could not have been torts against Sims."

116.   In *Sim*s, the court adjudicated the "merits" of  JPMC's  title to the property through the July 13, 2009 foreclosure sale and ejectment action and cited the courts holding in *Gallagher Bassett Servs., Inc. v. Phillips*, 991 So.2d697, 700 (Ala. 2008), finding the effect of JPMC's "voluntary dismissal without prejudice is to render the proceedings a nullity and leave the parties as if the action had never been brought"  – JPMC's foreclosure sale and foreclosure deed were rendered void ab initio.

117.   The court also adjudicated the property rights of Ms. Tipp's *predecessor in title*, finding that

> "... JPMC and Chase also cite *Williams v. Moore*, 36 So.3d 533, 540 (Ala.Civ.App. 2008), for the proposition that "successors in title are in privity with their predecessors in title" and argue that, because Sims conveyed any interest that she had in the property to Tipp via the quitclaim deed, privity existed between Sims and Tipp ..."

118.   Ms. Tipp was the prevailing party in the 2009 case with the right of possession  and was the legal title holder of record in the 2013 case – Ms. Tipp held "title and absolute authority" over the property.(*see Douglass*).

119.   JPMC had no  title to the property  and had neither right of possession or entry when Ms. Tipp's property was seized by forcible entry and trespass on December 11, 2010 in violation of a court order and signs posted by Ms. Tipp and unlawfully detained  and "the same constitutes at least **the equivalent of a <u>continuing invasion of plaintiff's property rights akin to a continuing trespass</u>** – a situation in which a new cause of action arises in plaintiff's favor ... each day." (*see Breland*)

120.   Ms. Tipp, *successor in title,* was not a party to the 2009 or 2013 cases but the court held "a judgment that had ascertained the property rights of the parties <u>in the earlier action</u> precluded relitigation of those same issues with regard to their *successors in interest"* –  Ms. Tipp is the "*successor in title*" and the 2013 case was the "earlier action."

121.   JPMC and CHASE BANK argued in its motion for summary judgment on

June 30, 2017,  that

> "Ms. Sims now seeks a judgment from the Court declaring the foreclosure sale void and her as the legal owner of the Property. However, even if the foreclosure sale were declared void, Ms. Sims would have no claim to the Property because she has conveyed all of her interest in the Property to her sister, Ms. Tipp … Ms. Sims has no standing to challenge JPMC's title to the Property.

122.    The court in Sims rendered the 2009 case "a nullity" but JPMC and CHASE BANK maintained JPMC's claims of " title to the Property" through the 2009 foreclosure sale.

123.    In *Adler v. Bank of New York Mellon*, Ala: Court of Civil Appeals 2016, the court held like JPMC,

> "Adler's argument is premised on the conclusion that the 2012 foreclosure deed is valid because it was never specifically declared void. In other words, Adler seeks to have this court hold that, although the 2012 foreclosure sale was void based on the circuit court's summary judgment in the 2012 action, the 2012 foreclosure deed remains valid and the mortgage should not be "reinstated." However, **based on the circuit court's ruling in the 2012 ejectment action and under the law applicable at the time of the 2012 ejectment action, BNYM2 did not acquire "standing" to foreclose on the property**; therefore, the summary judgment entered in favor of Adler in the 2012 ejectment action rendered the 2012 foreclosure sale invalid, and consequently, the 2012 foreclosure deed never validly existed."

124. In *Sims*, the court found the July 13, 2009 foreclosure sale was not "validated" and the court rendered the July 13, 2009 foreclosure proceedings "a nullity ... as if the action had never been brought.

125.    In *Sims*, the court found JPMC did not produce the note in the 2009 case and Ms. Sims's claims for "forgery only came to light in late 2013 when Sims was finally able 387*387 to obtain discovery" and in *Adler* the court held that

> "In *Nelson v. Federal National Mortgage Association*, 97 So.3d 770, 780 (Ala.Civ.App.2012), we explained that
>
> > "**[t]he complete absence of any evidence indicating that [Flagstar Bank, FSB ('Flagstar') ], was the owner of the debt, i.e., the holder of the note,** before June 5, 2009, when [Mortgage Electronic Registration Systems, Inc. ('MERS') ], as nominee for Flagstar, invoked the power of sale in the mortgage **means that MERS did not convey legal title to itself by virtue of the foreclosure deed because MERS had no authority to initiate**

**the foreclosure proceedings**. Consequently, the special warranty deed that [Federal National Mortgage Association] received from MERS two days after the foreclosure sale, which depended for its efficacy upon the validity of the MERS foreclosure deed, see 11 Thompson on Real Property § 94.07(b)(2)(I) at 390 (David A. Thomas 2d ed.2002), was also void." (emp)

126.   Ms. Tipp admits into evidence that JPMC never held the mortgage or note and conspired with its co-defendant's CHASE BANK and CHASE to perpetrate a fraud on the courts of this state and engage in mortgage fraud.

a.   Exhibit "D," evidences that on December 26, 2008, Citi-Residential Lending, ("Citi-Residential) sent notice to the US Bankruptcy Court that "Citi Residential Lending sold the above Real Estate Secured Loan to CHASE HOME FINANCE LLC ... Servicing of the same will be transferred effective January 1, 2009..."

b.   Exhibit "E,"evidences JPMC's record on January 6, 2009, that the "Name to Foreclose in = Chase Home Finance, LLC."

c.   Exhibit "F," evidences that on April 20, 2009, Chase Home sent notice of an "ARM Payment Change" to John C. McAleer, III, the bankruptcy trustee, that "Chase Home Finance LLC holds a Deed of Trust on the Property."

d.   Exhibit "G," evidences an assignment of Ms. Sims's mortgage was executed by Ameriquest in blank and the promissory note was endorsed in blank and were transmitted to Bankers Trust on November 22, 2002, by virtue of the LETTER OF TRANSMITTAL, B Collateral pursuant to the custody agreement dated June 30, 2000."

127.   JPMC was not the assignee of the mortgage, or holder of the note and in *Sturdivant v. BAC Home Loans Servicing, LP*, 159 So. 3d 15 Ala: Court of Civil Appeals 2011, the court found as here,  that

"Despite the fact that BAC did not own the mortgage, BAC held itself out to Sturdivant **as the "holder of the mortgage" with the power to conduct nonjudicial foreclosure proceedings.... The record indicates that those representations were demonstrably false**. ... It follows that, when a nonjudicial foreclosure sale is conducted by a party without "such power of sale," any foreclosure deed executed by that party as a vendor does not "vest[ ] ... legal title of the lands sold." In *Hrovat v. Bingham,* 341 S.W.2d 365 (Mo.Ct.App.1960), the Missouri Court of Appeals stated: "**The general rule is that if the holder of the mortgage has no right or power to foreclose, then the sale under an attempted foreclosure is void and no title is conveyed**...." (emp)

128.    On August 4, 2017, the same attorney's before this court argued

"... it absolutely cannot be disputed by [Ms. Sims] in good faith that the dismissal of the 2009 action was anything other than without prejudice. JPMC stated in the opening sentence of its Motion to Dismiss the 2009 Case (Doc. 373 at Exh. A) that it was moving to dismiss that action "WITHOUT PREJUDICE" ... That specific relief – without prejudice -- was requested again in the prayer for relief. **Consequently, when the Court granted JPMC's motion in the 2009 Case, ... it was granting a motion to dismiss the case without prejudice**. It is clear from the filings themselves, but ALA. R. CIV. P. 41(a)(2) also plainly provides that a dismissal by order of a court is without prejudice, unless otherwise specified in the order. Thus, **the true facts are that the dismissal of the 2009 Case was without prejudice and not an adjudication on the merits as to JPMC's ejectment claims.**

Despite the foregoing undisputed facts and law, [Ms. Sims] blatantly misrepresents the 2009 Case's dismissal by stating, "Judge Graddick granted JPMC's motion to dismiss its ejectment action but denied its request for possession of the Sims property. The order of dismissal was not without prejudice as JPMC had requested." (Id. at p. 3). These statements are unequivocally wrong. The Order did not deny the request for possession, since that relief was requested in the alternative. And, as demonstrated, the dismissal was without prejudice.

Not only is [Ms. Sims] wrong, but she has consistently argued precisely the opposite when it has been convenient to her defending Defendants res judicata defense. ...[Ms. Sims] acknowledged that the 2009 Case was dismissed without prejudice, and even correctly asserted that JPMC could have re-filed the ejectment action in another lawsuit (Id. at pp. 3-4).

... she favorably cited to the Opinion of the Alabama Court of Civil Appeals in this action and its following quote from *Gallagher Bassett Servs., Inc. v. Phillips*, 991 So.2d 697, 700 (Ala. 2008): "'[T]he effect of a voluntary dismissal ... is to render the proceedings a nullity and leave the parties as if the action had never been brought.'" …

129.    JPMC's alternative request was for "permission to secure the property" – "... [t]here is still personal belongings at this location."

130.    JPMC argued the 2009 case was not adjudicated "on the merits" and JPMC could "re-file" the "same claims" that were dismissed, but Ms. Tipp's claims to recover possession of her property that was seized by forcible entry and trespass in December 11, 2010  and unlawfully detained were barred by "res judicata."

131.    The record evidences, JPMC did not "re-file" the "ejectment action in

another lawsuit."

132.   In *Morgan v. Allstate Prop. & Cas. Ins. Co.*, 1:19 CV 345, at *5-6 (W.D.N.C.Apr. 13, 2020),  the court held

> "if a plaintiff voluntarily dismisses a filed action without prejudice, the Rules allow a new action on the same claim to be filed within one year of the dismissal, even if otherwise barred by the statute of limitations." *Leardini v. Charlotte- Mecklenburg Bd. of Educ.*, No. 3:09-CV-264, 2011 WL 1234743, at *1 (W.D.N.C. Mar. 29, 2011) (citing N.C.G.S. § 1A-1, Rule 41(a)(1))."

133.   Pursuant to the court's holding in *Morgan*, JPMC had "one year" from the dismissal of the ejectment action on August 30, 2010 to "re-file" those same "dismissed claims" even if barred by the statute of limitations or the dismissal ripens into an adjudication on the merits - a dismissal with prejudice.

134.   JPMC's "voluntary" dismissal  "ripened" on August 30, 2011, prior to the courts judgment on September 16, 2011 that was predicated on a void judgment and a dismissal with  prejudice.

135.   JPMC and CHASE BANK cite the courts holding in *Sims* that the 2009 case was "a nullity"  but JPMC and CHASE BANK maintains JPMC's "dismissed claim" of "title to the Property" through the July 13, 2009 foreclosure sale that was rendered void ab initio.

136.   In *Adler v. Bank of New York Mellon*, Ala: Court of Civil Appeals 2016, the court had a similar situation and found

> "Adler's argument is premised on the conclusion that the 2012 foreclosure deed is valid because it was never specifically declared void. In other words, Adler seeks to have this court hold that, although the 2012 foreclosure sale was void based on the circuit court's summary judgment in the 2012 action, the 2012 foreclosure deed remains valid … consequently, the 2012 foreclosure deed never validly existed..."

137.   On remand, Ms. Tipp submitted an affidavit and documents including photos of signs posted on September 9, 2010 after the dismissal of the 2009 case to "KEEP OUT" and "NO TRESPASSING:PRIVATE PROPERTY," dumpster's on her property on December 11, 2010 and a for sale sign showing her property had been sold.

138.   JPMC and CHASE BANK  then argued on November 17, 2017 that

> "[w]ith respect to the Court's question about the necessity of a writ of possession or other court order in order to remove personal property from the

Property, Defendants submit that no such writ or order would have been necessary in this instance...

On August 27, 2010, JPMC moved the Court for a voluntary dismissal of its ejectment suit after JPMC's agent represented in an affidavit that the Property was vacant, and the Court subsequently granted the motion.

Although [Ms. Sims] now challenges JPMC's 2010 representations about the Property being vacant, [Ms. Sims] and her attorneys remained silent at that time and allowed the ejectment action to be dismissed.

Because any personal property remaining in the Property had been abandoned by [Ms. Sims], Defendants submit that no writ of possession or court order would have been required to remove abandoned property."

139.   JPMC "moved the Court for a voluntary dismissal of its ejectment suit" pursuant to Rule 41,  or in the alternative "permission to secure the property" but JPMC had neither the right of possession or entry and Judge Graddick granted neither – the entry onto Ms. Tipp's property was "unauthorized" and in violation of Judge Graddick's order of dismissal.

140.   JPMC's affidavit actually evidenced,    "... [t]here is still personal belongings at this location"  and on December 2, 2010,  defendant's records evidenced that could be an "issue" for the "unauthorized" trashout, but defendant's cleared that right up - "... We will move forward as a Vacant property and ... remove all remaining items left behind" without a court order or writ of possession and in violation of signs posted on the property.

141.   JPMC's "burden" was not to prove the property was "vacant" –  in the ejectment action JPMC had the burden "to prove superior title to the property." (see *Maiden)* but

142.   JPMC's foreclosure deed was **unexecuted and unrecorded and has never been executed and recorded** – JPMC "could not prove that it held title" at the commencement of the action and "lacked standing to maintain the ejectment action, the trial court lacked subject-matter jurisdiction over this case."(*see Cadle*)

143.   JPMC and CHASE BANK's records evidenced on remand that Ms. Sims's mortgage was transmitted to Bankers Trust on November 22, 2002, by virtue of the LETTER OF TRANSMITTAL, B Collateral pursuant to the custody agreement dated

June 30, 2000" 6 years, 7 months, 3 weeks prior to the July 13, 2009 foreclosure sale. (Exhibit G)

144.   JPMC was not the assignee of Ms. Sims's mortgage and did not have the "power to conduct nonjudicial foreclosure proceedings" – JPMC's "representations were demonstrably false." (*see Sturdivant*)

145.   JPMC and CHASE BANK took the deposition testimony of Ms. Sims, *predecessor in title*, and Ms. Tipp, *successor in title*, and on June 30, 2017 evidenced to the court that

> "The Alabama Supreme Court has held that "[f]or a declaratory-judgment action to withstand a motion to dismiss there must be a bona fide justiciable controversy that should be settled," and **"[i]f no justiciable controversy exists when the suit is commenced, then the court lacks jurisdiction."** *Ex parte Valloze*, 142 So.3d 504, 508 (Ala. 2013) (internal citations omitted). "A controversy is justiciable where present 'legal rights are thwarted or affected [so as] to warrant proceedings under the Declaratory Judgment statutes.'" Id. at 509 (quoting *Harper v. Brown, Stagner, Richardson, Inc.,* 873 So.2d 220, 223 (Ala. 2003)). Furthermore, the Court has acknowledged that "[a]n essential component of justiciability is whether the plaintiff has standing to sue, ... and standing turns on whether the party has suffered an actual injury and whether that injury is to a legally protected right." *Ex parte Richardson,* 957 So.2d 1119, 1125 (Ala. 2006). ... With respect to standing, the Court stated "[t]o say that a person has standing is to say that that person is a proper party to bring the action. To be a proper party, the person must have a real, tangible interest in the subject matter of the lawsuit." *Doremus v. Bus. Council of Alabama Workers' Comp. Self-Insurers Fund*, 686 So.2d 252, 253 (Ala. 1996). Ms. Sims now seeks a judgment from the Court declaring the foreclosure sale void and her as the legal owner of the Property. However, even if the foreclosure sale were declared void, Ms. Sims would have no claim to the Property because she has conveyed all of her interest in the Property to her sister, Ms. Tipp. (Sims depo. at pp. 115-16, 118-19 and Exh. 12; Tipp depo. at pp. 22-23, 25-26 and Exhs. 3 and 4)12-13

146.   On remand there were mediations between Ms. Sims and the defendant's and Ms. Tipp would always remind the attorney that no on could enter into a settlement agreement on the property without her consent.

147.   Ms. Sims "admittedly has no legal interest in the Property after deeding it to Ms. Tipp nearly eight (8) years ago" and like in *Wilmore,* Ms. Sims "had divested [herself] of all interest in the property" and had no legal authority regarding the property.

148.   Summary judgment motions by all  parties were pending and around the end of February 2018, after all the costs of litigation had been paid by Ms. Tipp since 2009 and the 2013 case was scheduled for trial, Ms. Tipp was asked to execute a fee agreement as attorney-in-fact for Ms. Sims "just in case."

149.   Ms. Tipp, without question, trusted not her attorney, but someone she considered her friend, and on March 2, 2018,  although she could barely function to make it to the office and then back to the car, she executed an agreement as attorney-in-fact for Ms. Sims – Ms. Sims' claims were against CHASE BANK.

150.   Ms. Sims "quitclaimed all of her interest in the Property to Ms. Tipp, who is not a party to this action" but around the first of June 2018, Ms. Tipp received a call that the defendant's had made a settlement offer of $225,000.00 with the stipulation that she, as the *successor in title* and legal title holder of record, "consent" to all parties settling claims to her property with Ms. Sims, the *predecessor in title* after it was seized by forcible entry and trespass and unlawfully detained by defendant's – an "offer" she refused.

151.   That offer had been refused by the attorney's but Ms. Tipp was asked to meet  to prepare for trial on Ms. Sims's claims against CHASE BANK.

152.   After the attorney's spiel regarding evidence, etc., Ms. Tipp realized she wasn't there to prepare for trial on Ms. Sims's claims – she was there to relinquish her interest to the property so those claims could be settled on behalf of Ms. Sims to "avoid trial."

153.   After Ms. Tipp refused the 'offer' to relinquish her legal title and right to possession of the  property, she was told "*we don't need you*" to settle those claims because Ms. Sims could revoke her power of attorney.

154.   Ms. Tipp's parents didn't raise a fool and while Ms. Tipp isn't an attorney, she doesn't need an attorney to interpret the law – Ms. Sims revoking her power of attorney did not transfer title to the property back to her.

155.   On August 22, 2009, Ms. Tipp paid Ms. Sims for a quit claim deed to the home of her parents that Ms. Sims had willingly lost in foreclosure and would have lost in foreclosure by default.

156.   By the dismissal of the 2009 case, the July 13, 2009 foreclosure sale "never

validly existed." (*see Adler*)  Ms. Tipp saved the home of her parents from foreclosure.

157.    During her efforts to save the home of her parents, Ms. Tipp recovered the  2 acres for Ms. Sims that JPMC had taken possession of at no cost to her that she later sold for $30,000.00 and even if Ms. Sims knew the 2 acres wasn't properly described in the mortgage, she would have had to obtain an attorney to recover the property.

158.    Ms. Tipp paid the costs to file declaratory judgment actions that prevented the property being sold. If not for Ms. Tipp, there would not have been a 2013 case, there would not have been attorney's and Ms. Sims would not have had claims against CHASE BANK for forgery.

159.    The court in *Sims* rendered the 2009 case and JPMC's foreclosure sale  "a nullity … as if the action had never been brought."

160.    The court found Ms. Sims "conveyed any interest that she had in the property to" Ms. Tipp in August 2009 and under prevailing law, "an assignment passes the title to the assignee so that **[s]he is the owner of any claim** arising from the chose **and should be treated as the real party in interest under Rule 17(a)**." (*Ex parte Simpson*, 36 So. 3d 15 – Ala: Supreme Court 2009). (emp)

161.    Ms. Tipp had legal title and legal possession of the home of her parents by the dismissal of the 2009 case on August 30, 2010, when it was seized by forcible entry and trespass on December 11, 2010 and she had the right to recover possession.

162.    There was an "Interior BPO" done on 10/5/2009 with a "Repaired Amount 104000.00, As Is 94000.00" with estimated repairs $5000-$7500.

163.    The house was built prior to 1890 and Ms. Tipp wanted to take it back in time as a "home place" as her parents wanted for their children and grandchildren to have Sunday dinners, Thanksgiving and Christmas, a place for relatives from out of town, and as the only home place of her classmates remaining, a place for them to gather.

164.    Ms. Tipp was putting the home of her parents in an irrevocable trust so it could not be sold upon her death.

165.    But after defendant's disposed of everything of Ms. Tipp's parents that was in their home that she had legal title to and legal possession of, defendant's then destroyed their house itself.

166.    A new roof had been put on sometime around 2005 following a hurricane

and defendant's records evidenced there were roof leaks where blue tarps were put on the roof repeatedly and then tore off.

167.    Whether the roof was damaged by storms or hurricanes later, Ms. Tipp does not know – she was locked out of her house.

168.    JPMC asserted in its alternative request to secure the property that JPMC "needs to be able to secure the premises to prevent the further deterioration of the property," but without legal title or legal possession possession of the property and ongoing court battles, defendant's failed to preserve the property.

169.    Defendant's records evidenced on February 4, 2013 that there "had showings but **the dwelling in such bad shape. <u>Serious buyers are only interested in land value.</u>** See what you can do."(emp)

170.    On September 23, 2014 there was an "Interior BPO … **30 day value: 0.00**."

171.    JPMC did not have any legal interest in the property and had the property been sold, the home of Ms. Tipp's parents would have been torn down.

172.    Ms. Tipp made periodic trips to the property when she was in Grand Bay, and would stop and look through the front windows and front door because she was locked out of her house and there was black mold and rain rot and the ceilings had fallen in.

173.    The house that was erected before 1890 survived every major hurricane on the gulf coast and had withstood the test of time, but could not survive the neglect and abuse by defendant's.

174.    The the interior BPO on Ms. Tipp's property went from $104,000.00 in October 2009 to $0.00 in September 2014, but Ms. Tipp was told she wasn't entitled to recover damages to her property that was seized and unlawfully detained, because "*Elizabeth borrowed that money and didn't pay it back.*"

175.    Ms. Tipp was not a party to the mortgage, was not responsible for the default or for defendant's unlawfully detaining her property for years where it deteriorated beyond repair and needs to be reconstructed.

176.    Ms. Tipp's property rights and right to recover possession of her property, was the "law of the case."

177.   In *Sims*, the court held   "Sims conveyed any interest that she had in the property to Tipp via the quitclaim deed"  and "[u]nder the doctrine of the "law of the case," whatever is once established between the same parties in the same case continues to be the law of that case" (*Wehle v. Bradley* 195 So. 3d 928 - Ala: Supreme Court 2015)

178.   On June 30, 2017, JPMC and CHASE BANK evidenced that

"... there is no justiciable controversy and Ms. Sims lacks standing to assert the claim because well before filing this case, she quitclaimed all of her interest in the Property to Ms. Tipp, who is not a party to this action...

On August 22, 2009, following the foreclosure sale, Ms. Sims executed a Quitclaim Deed of the Property to Ms. Tipp in which she conveyed to Ms. Tipp "all the right, title, interest and claim or demand which the [Ms. Sims] may have had" in the Property. (Sims depo. at Exh. 12). She subsequently executed a Correction Deed on October 15, 2009, which likewise conveyed to Ms. Tipp "all the rights, title, interest and claim or demand" to the Property. (Id.; Tipp depo. at Exh. 4). Both Ms. Sims and Ms. Tipp confirmed in their depositions that Ms. Tipp has not deeded the Property back to Ms. Sims, nor has she executed anything transferring any rights to the Property back to Ms. Sims. (Sims depo. at pp. 118; Tipp depo at pp. 25-26). Thus, the allegation in the Amended Complaint that "[t]itle to the property remains in [Ms. Sims]" is factually inaccurate and completely refuted by Ms. Sims' own acknowledgment that she has no legal interest in the Property after deeding it to Ms. Tipp, and had no such interest when she filed suit or when she filed the First Amended Complaint containing the foregoing allegation. (First Amended Complaint at ¶ 25; Sims depo. at p. 119). 13-14

... In *Wilmore v. Wilmore,* 91 So.3d 701 (Ala. Civ. App. 2011), ... like Ms. Sims, the appellants had executed a quitclaim deed to the property which conveyed their interests in the property to the appellee and her ex-husband. Because the appellants had divested themselves of all interest in the property, the Court held that the appellants "ha[d] no legal standing to challenge any action taken by the trial court regarding that property." Id. At 706. Furthermore, the Court explained that "[a] party lacks standing to invoke the power of the court in the absence of 'a concrete stake in the outcome of the court's decision.'" Id.14

... In summary, Ms. Sims admittedly has no legal interest in the Property after deeding it to Ms. Tipp nearly eight (8) years ago. (Sims depo. at p. 119). Accordingly, there is no justiciable controversy because Ms. Sims has no standing to challenge JPMC's title to the Property. Therefore, her request for declaratory judgment is due to be dismissed."

179.   JPMC argued Ms. Sims "lacked standing," and in *Ex parte Sterilite Corp. of Alabama*, 837 So. 2d 815 - Ala: Supreme Court 2002, the court held a "lack of standing is

a jurisdictional defect and `cannot be cured …"

180.   In *Gardens at Glenlakes v. Baldwin Sewer*, 225 So. 3d 47 Ala: Supreme Court 2016, the court held JPMC's argument was "... in fact, a real-party-in-interest inquiry. This question is distinct from the question of standing: It does not implicate the subject-matter jurisdiction of the trial court, and the trial court can address the issue, if properly raised, by applying Rule 17(a), Ala. R. Civ. P. …"

181.   In its motion on August 4, 2017, JPMC and CHASE BANK evidenced

"... Consequently, when the Court granted JPMC's motion in the 2009 Case, ... it was granting a motion to dismiss the case without prejudice. It is clear from the filings themselves, but ALA. R. CIV. P. 41(a)(2) also plainly provides that a dismissal by order of a court is without prejudice, unless otherwise specified in the order. Thus, **the true facts are that the dismissal of the 2009 Case was without prejudice and not an adjudication on the merits as to JPMC's ejectment claims**. ...

[Ms. Sims] acknowledged ... even correctly asserted that **<u>JPMC could have re-filed the ejectment action</u>** in another lawsuit ... she favorably cited to the Opinion of the Alabama Court of Civil Appeals in this action and its following quote from *Gallagher Bassett Servs., Inc. v. Phillips,* 991 So.2d 697, 700 (Ala. 2008): **"[T]he effect of a voluntary dismissal ... is to render the proceedings a nullity and leave the parties as if the action had never been brought**.'"  (emp)

182.   JPMC's foreclosure deed was **unexecuted and unrecorded** – JPMC could not prove "legal title" and Ms. Tipp was the legal title holder of record and prevailing party in the 2009 ejectment action "without the necessity of proving [her] title in the property." (*see Maiden*)

183.   Ms. Tipp was the prevailing party in the 2009 case and the title holder of record in the 2013 case with "title and absolute authority" over the property (*see Douglass*), but after preventing the loss of the property by default, preventing losing the property through an unauthorized foreclosure sale and preventing the property from being sold,  recovering 2 acres Ms. Sims sold for $30,000.00 and paying all the legal costs for 9 years, Ms. Tipp was told if she wanted to recover possession of her property that she had legal title to and legal possession of when it was seized and unlawfully detained, she would have to file another lawsuit against JPMC.

184.   Under  prevailing law, "an assignment passes the title to the assignee so

that **[s]he is the owner of any claim** arising from the chose and should be treated as the real party in interest under Rule 17(a)." (emp) (*see Ex parte Simpson*)

185. On June 13, 2018, there was a settlement conference between the parties and again, Ms. Tipp reminded the attorney they could not settle claims to the property without her consent and the next day when she called to discuss the offer on the property, she was denied that information.

186. Ms. Tipp called the court and a notice was filed by the "same parties" in the 2009 case that that the court in *Sims* found had no legal interest in the property had reached a settlement and the court entered an order that the stipulation of the parties was due in 30 days.

187. Ms. Tipp was told she wasn't entitled to recover damages to the property itself because "*Elizabeth borrowed that money and didn't pay it back,*" but the same attorney's entered into a "confidential" settlement agreement on behalf of Ms. Sims in excess of $225,000.00, setting claims to property Ms. Sims had no legal interest in or legal authority over where she recovered possession of the property that she had already lost in foreclosure after it was given to her by her mother – Ms. Tipp recovered nothing.

188. Ms. Tipp received a letter from the attorney dated June 20, 2017, enclosing Ms. Sims's letter "formally" revoking the power of attorney executed on August 22, 2009 "to handle the litigation with the Bank over the foreclosure. Please do not take any further action on my behalf."

189. Ms. Tipp's title to the property was not subject to Ms. Sims's 'power of attorney. In *Sims*, the court found "Sims had conveyed any interest that she had had in the property to Tipp in August 2009" and "an assignment passes the title to the assignee." (*see Ex parte Simpson*)

190. In *Etransmedia Technology, Inc. v. Allscripts Healthcare, LLC,* Dist. Court, ND Illinois, the court held Ms. Sims "formally" revoking the power of attorney "is not the equivalent of an assignment of ownership. ... it does not purport to transfer title or ownership..." and an "assignment of a legal claim occurs—depriving the assignor of real-party-in-interest status."

191. Ms. Tipp's title to the property was not subject to JPMC's foreclosure sale – the dismissal of the 2009 case rendered the foreclosure sale void ab initio "as if the action

had never been brought." (*see Sims*)

192.   On June 30, 2018,  JPMC recorded a quit claim deed executed on June 19, 2018, purporting to convey all  of JPMC's  title and interest it had in the property  to Ms. Sims, *predeces*sor in title,  by virtue of a foreclosure sale that was rendered "a nullity" by the court in *Sims.*

193.   In *Adler*, the court held that the dismissal of the "ejectment action ... rendered the  ... foreclosure sale invalid, and, consequently, the ... foreclosure deed never validly existed"  and "Consequently ... [Ms. Sims' quitclaim] deed which depended ... its efficacy upon the validity of the ... foreclosure deed ... was also void ..."

194.   Ms. Sims "quitclaimed all of her interest in the Property to Ms. Tipp, who is not a party to this action" and in *Kearney v. Cavalry Portfolio Services, LLC,* Dist. Court, ED New York 2014, the court held that "[w]here, as here, the valid assignment of a claim is absolute on its face and the assignor is divested of all control and right to the cause of action, the assignee is the proper party in interest."

195.   Ms. Tipp, the assignee, was the "proper party in interest" and legal title holder of the property, but on  July 7, 2018,

> "by and through their undersigned counsel of record, and hereby jointly stipulate to the dismissal, with prejudice, of all claims and causes of action t**hat have or could have been asserted by [Ms. Sims]** against Defendants in the above-styled action."

196.    The parties in the 2013 case that had no legal authority over the property, stipulated to the dismissal of Ms. Tipp's claims regarding the recovery of her property "with prejudice."

197.   On July 9, 2018, the court entered an order "Upon the joint stipulation of the parties, this matter is hereby DISMISSED WITH PREJUDICE **as to all parties** and all claims" - Ms. Tipp was not a party to the case and did not stipulate to releasing her claims or right to recover possession of her property.

198.   The court in *Sims* found JPMC and CHASE BANK argued  "Sims conveyed any interest she had in the property to Tipp" and on remand,  JPMC and CHASE BANK evidenced "Ms. Sims lacks standing to assert the claim because well before filing this case, she quitclaimed all of her interest in the Property to Ms. Tipp, who is not a party to this action  ... she has conveyed all of her interest in the Property to her sister, Ms. Tipp

nearly eight (8) years ago."

199.    In *Greer v. O'Dell*, 305 F.3d 1297, 1302-3 11th Cir. 2002, the court held "the purpose of the real party in interest rule is "to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." … the purpose of Rule 17(a) is "to protect individuals from harassment of suits by persons who do not have the power to make final and binding decisions concerning prosecution, compromise and settlement."

200.    The "confidential" settlement agreement between Ms. Sims, JPMC and CHASE BANK has no res judicata effect to bar Ms. Tipp's claims and is not binding on Ms. Tipp, *successor in title*, because she is the real party in interest with  "the power to make final and binding decisions concerning … compromise and settlement"  regarding her property. (*see Greer*)

201.    In *Miller & Miller Constr. Co. v. Madewell*, 920 So.2d 571, 572-73 (Ala.Civ.App.2005), the court held that

> "... under a judgment entered by this court, the actions of … counsel ... fly in the face of the "law of the case" doctrine. "[U]nder the `law of the case' doctrine, `whatever is once established between the same parties in the same case continues to be the law of that case, … *Lary v. Flasch Bus. Consulting*, 909 So.2d 194, 198 (quoting *Blumberg v. Touche Ross & Co*., 514 So.2d 922, 924 (Ala.1987)."

202.     In *Sims*, the court "a judgment that had ascertained the property **rights** of the parties <u>in the earlier action</u> precluded relitigation of those same issues with regard to their *successors in interest"* - the "earlier action" was the 2013 case,

203.    In *Walden,* the court held that even though Ms. Tipp was not a party to the 2013 case, "**the parties in this lawsuit are identical to or in privity with the parties"**  and citing *Miller & Miller Constr. Co. v. Madewell*, 920 So.2d 571, 572-73 (Ala.Civ.App.2005),

> "`**The law-of-the-case doctrine provides that when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the same case**, thereby hastening an end to litigation by foreclosing the possibility of repeatedly litigating an issue already decided."'

> ...we see no reason to reconsider this issue in the present appeal. Nor was the Autauga Circuit Court permitted to reconsider the issue; in fact, **it is well**

settled that a trial court may not issue an order that is in direct contravention of an opinion of this Court:

> "`"A lower court is without power to modify, alter, amend, set aside or in any manner disturb or depart from the judgment of the reviewing court as to any matter decided on appeal ..."'(emp)

204.   In *Erbe v. Eady,* 447 So.2d 778, 779 (Ala.Civ.App. 1984), "… after a decision on appeal, `issues decided by the appellate court become law of the case."

205.   JPMC and CHASE BANK's "confidential settlement agreement" with Ms. Sims, is not here nor there as far as the courts ruling in *Sims* because  in *Walden*, the court held a "lower court is without power to modify, alter, amend, set aside or in any manner disturb or depart from the judgment of the reviewing court as to any matter decided on appeal" –  "the parties" in the 2013 case could not alter the property rights of the parties by  a "joint stipulation" of the parties by consent.

206.   The "confidential settlement agreement" has no effect on Ms. Tipp's claims before this court as *successor in title* with "title and absolute authority" over the property since August 22, 2009.

207.   Ms. Tipp has the right to exercise her "property rights" that were adjudicated on the merit in *Sims* to recover possession of her property.

208.   JPMC voluntarily dismissed the 2009 case on August 30, 2010 and the court in Sims rendered the case "a nullity" and in *Williams v. Taylor Seidenbach, Inc*., 958 F.3d 341, 362 (5th Cir. 2020), the court held

> "a voluntary dismissal with prejudice plainly **moots a case: "When the plaintiffs ask[ ] the District Court to dismiss their claims, they consent[ ] to the judgment against them and disavow[ ] any right to relief** ...." *Microsoft Corp. v. Bake*r , ⸻ U.S. ⸻, 137 S. Ct. 1702, 1717, 198 L.Ed.2d 132 (2017) (Thomas, J., concurring in the judgment). **So too for voluntary dismissals without prejudice.** Although the plaintiff "is entitled to bring a later suit on the same cause of action," he has agreed that this one should go no further. *Ryan* , 577 F.2d at 302. **It follows, then, that ** a Rule 41(a) dismissal represents a voluntary abandonment of the entire action, and deprives us of jurisdiction over any element of the dispute." (emp)

## **FIRST CLAIM**

*Denial of due process of the law.*

209.   Ms. Tipp incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

210.   The Fifth and Fourteenth Amendments, prevent an "unjust taking" and demands due process of the law based on prevailing law and statutes. Ms. Tipp's due process rights were violated when she was deprived of property by an unappealable order of dismissal where JPMC voluntarily dismissed it's complaint for the purpose of  going *'beyond the reach of the court'* to take the property by forcible entry and trespass where JPMC could not prevail on its ejectment claims.

211.   JPMC violated a court order entered on August 30, 2010 when Defendant's went onto Ms. Tipp's property, with signs posted, and conducted an unauthorized 'trash out' on Ms. Tipp's property and rekeyed the locks and locked Ms. Tipp out of  her house that she had legal title to and legal possession of.

212.   The court in *Sims* held  the effect of JPMC's voluntary dismissal without prejudice "is to render the proceedings a nullity and leave the parties as if the action had never been brought.'"

213.   The dismissal of the 2009 case rendered the "foreclosure sale invalid, and, consequently, the ... foreclosure deed never validly existed." (*Adler v. Bank of New York Mellon*, Ala: Court of Civil Appeals 2016)

214.   In *Sims*  the court found  "because Sims conveyed any interest that she had in the property to Tipp via the quitclaim deed, privity existed between Sims and Tipp."

215.   JPMC and CHASE BANK evidenced Ms. Sims had  "no claim to the Property because she has conveyed all of her interest in the Property to her sister, Ms. Tipp nearly eight (8) years ago …" and "… there is no justiciable controversy to be settled by the Court … Ms. Sims lacks standing to assert the claim because well before filing this case, **she quitclaimed all of her interest in the Property to Ms. Tipp, <u>who is not a party to this action</u>** … Ms. Sims and Ms. Tipp confirmed in their depositions that Ms. Tipp has not deeded the Property back to Ms. Sims, nor has she executed anything transferring any rights to the Property back to Ms. Sims. (Sims depo. At pp. 118; Tipp

depo at pp. 25-26)."

216.   Under  prevailing law, "an assignment passes the title to the assignee so that [s]he is the owner of any claim arising from the chose and should be treated as the real party in interest under Rule 17(a)*" (Ex parte Simpson,* 36 So. 3d 15 – Ala: Supreme Court 2009).

217.   The parties in the 2013 case entered into a "confidential" settlement agreement settling claims to property neither JPMC nor Ms. Sims had a legal interest in.

218.   JPMC recorded a quit claim deed on June 30, 2018 executed in favor of Ms. Sims to property it had no legal title to purporting to convey JPMC's "interest" in the property to her.

219.   In *Kearney v. Cavalry Portfolio Services, LLC,* Dist. Court, ED New York 2014, the court held that "[w]here, as here, the valid assignment of a claim is absolute on its face and the assignor is divested of all control and right to the cause of action, the assignee is the proper party in interest" but on  July 7, 2018, the parties in the 2013 case stipulated to the dismissal of claims to the property 'WITH PREJUDICE" that neither party had legal authority over.

## SECOND CLAIM

*National Bank Act, 12 U.S.C.A. § 1 et seq.,*

220.   Ms. Tipp incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

221.   The NBA specifically authorizes federally chartered banks to engage in real estate lending, 12 U. S. C. §371, and "[t]o exercise … such incidental powers as shall be necessary to carry on the business of banking," §24 Seventh. Among incidental powers, national banks may conduct certain activities through "operating subsidiaries," discrete entities authorized to engage solely in activities the bank itself could undertake, and subject to the same terms and conditions as the bank. See §24a(g)(3)(A); 12 CFR §5.34(e).

222.   JPMC engages in mortgage fraud and fraud on the court and asserted it had "full authority to conduct foreclosures and initiate ejectment proceedings in Alabama" under federal law, contrary to Tipp's assertions."

223.   The OCC overseas licensed operating subsidiaries. JPMC, a 'wholly owned

subsidiary' of CHASE BANK, is not an OCC licensed "operating subsidiary" of CHASE BANK and "conducts certain activities" that are not "incidental" to the business of banking that constitute mortgage fraud.

224.   CHASE BANK, "a federally chartered bank," is in fact engaging in "non-banking" activity and mortgage fraud through an uncontrolled rogue entity that is not regulated by any federal agency or the prevailing laws of this state.

## THIRD CLAIM

(Federal Civil RICO, 18 U.S.C. 3 1962(c))

225.   Ms. Tipp incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

226.   Each Defendant violated 18 U.S.C. 3 1962(c) by the acts described in the prior paragraphs.

227.   Each of the Defendant's engaged in the conducted their affairs through a continuing pattern of racketeering activity.

228.   Each of the Defendant's have falsely asserted ownership of the mortgage at issue  through the state courts and/or bankruptcy court.

229.   Defendant CHASE asserted claims to the bankruptcy court that on December 26, 2008 and April 20, 2009, that CHASE was the owner of the mortgage and "Deed of Trust" it acquired  from Citi-Residential.

230.   On July 13, 2009, JPMC foreclosed on the mortgage claiming to be the assignee of Ms. Sims's mortgage.

231.   On February 22, 2010, JPMC argued that

"On September 25, 2008, the Office of Thrift Supervision ("OTS") seized Washington Mutual Bank ("WaMu") from Washington Mutual, Inc., and placed it into the receivership of the Federal Deposit Insurance Corporation (the "FDIC"). Pursuant to a Purchase and Assumption Agreement between the FDIC and JPMorgan Chase Bank, National Association ("Chase"). Plaintiff is a subsidiary of Chase; the subject mortgage was one of the assets purchased by Chase."

232.   Defendant's records evidence that at the time of the known false statements, an assignment of Ms. Sims's mortgage was executed by Ameriquest in blank and the

promissory note was endorsed in blank and were transmitted to Bankers Trust on November 22, 2002, by virtue of the LETTER OF TRANSMITTAL, B Collateral pursuant to the custody agreement dated June 30, 2000.

233.   On July 30, 2009, JPMC caused to be recorded in the probate records a foreclosure deed that was not of record in the 2009 ejectment action that was commenced on July 24, 2009 to property JPMC had no valid legal interest in.

234.   On June 30, 2018, JPMC caused to be recorded in the probate records a quit claim deed executed in favor of Ms. Sims on June 19, 2018 to property JPMC had no valid legal interest in.

235.   Defendant's have engaged in a pattern of rackettering activity and criminal activity to willfully and unlawfully deprive Ms. Tipp recovery of property she had legal title to and legal possession of.

236.   JPMC violated a court order entered on August 30, 2010 when Defendant's went onto Ms. Tipp's property, with signs posted, and by forcible entry and trespass, conducted an unauthorized 'trash out' on Ms. Tipp's property and rekeyed the locks and locked Ms. Tipp out of her house that she had legal title to and legal possession of.

237.   Defendant's seized and unlawfully detained Ms. Tipp's property and caused permanent structural damage where the interior BPO went from $104,000 to $0.00. Defendant's negligently maintained the house where roof leaks caused black mold, rain rot and the ceilings to fall in.

238.   Defendant's have engaged in a pattern of rackettering activity  willfully and unlawfully to deprive Ms. Tipp recovery of property she had legal title to and legal possession of when Defendant's conspired to settle claims to Ms. Tipp's property in a *"secret agreement"* with Ms. Tipp's *predecessor in title*  contrary to prevailing law and in direct contravention of the opinion of the court in *Sims*,  where the court found "because Sims conveyed any interest that she had in the property to Tipp via the quitclaim deed, privity existed between Sims and Tipp."

239.   Ms. Tipp, *successor in title* and the legal title holder of record with the right of possession,  was not notified  of the settlement on her property,  made a party to the "*secret agreement*" and was not "privy" to the terms of the *"secret agreement"* unlawfully disposing of her claims and her property.

240.    JPMC conveyed Ms. Tipp's property to the *predecessor in title* by a fraudulent quit claim deed under color of law slandering Ms. Tipp's title where JPMC had no legal title through the foreclosure sale.

241.    Defendant's have engaged in a pattern of rackettering activity willfully and unlawfully to deprive Ms. Tipp's recovery of property she had legal title to and the right of possession by "maintaining" the same "cause of action" that was dismissed and not re-filed and contrary to the courts opinion in *Sims*.

242.    The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in 2009 and continuing to the present, and there is a continued threat of repetition of such conduct by Defendant's to bar Ms. Tipp's recovery of her property she has legal title to and the right of possession.

243.    The racketeering activity of Defendant's constitute a criminal enterprise for the purpose of engaging in mortgage fraud, bank fraud, forgery, forcible entry and trespass.

244.    JPMC,   CHASE BANK  and CHASE conspired to violate RICO § 1962(a).


## **FOURTH CLAIM**

*Common Law Fraud and Conspiracy Fraud and Collusion*

245.    Ms. Tipp incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

246.     The parties in the 2013 case entered into a "secret agreement" to defraud Ms. Tipp of the recovery of her property.

247.    JPMC and CHASE BANK evidenced on June 30, 2017 that

"… there is no justiciable controversy and Ms. Sims lacks standing to assert the claim because well before filing this case, she quitclaimed all of her interest in the Property to Ms. Tipp, who is not a party to this action … … there is no justiciable controversy to be settled by the Court because Ms. Sims lacks standing to assert her claim for relief."

248.   Under  prevailing law, "an assignment passes the title to the assignee so that [s]he is the owner of any claim arising from the chose and should be treated as the real party in interest under Rule 17(a)" *(Ex parte Simpson,* 36 So. 3d 15 – Ala: Supreme Court 2009)

249.   On  July 7, 2018, all parties in the 2013 case stipulated to disposing of all claims to the property neither party had an interest in or legal authority over

> "by and through their undersigned counsel of record, and hereby jointly stipulate to the dismissal, with prejudice, of all claims and causes of action t**hat have or could have been asserted by [Ms. Sims]** against Defendants in the above-styled action."

250.   On July 9, 2018, the court entered an order "[u]pon the joint stipulation of the parties, this matter is hereby DISMISSED WITH PREJUDICE as to all parties and all claims ..."

## FIFTH CLAIM

*forgery and fraudulent documents*

251.   Ms. Tipp incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

252.   On July 30, 2009, JPMC caused to be recorded in the probate records a foreclosure deed that was not of record in the 2009 ejectment action that was commenced on July 24, 2009 to property JPMC had no valid legal interest in.

253.   On June 30, 2018, JPMC caused to be recorded in the probate records a quit claim deed executed in favor of Ms. Sims on June 19, 2018 to property JPMC had no valid legal interest in.

## SIXTH CLAIM

*Trespass  is a wrong to the right of possession*

254.   Ms. Tipp incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

255.   "**A trespass to property is <u>a wrong against the right of possession</u> or entry.**" *Boyce v. Cassese,* 941 So.2d 932, 945 (Ala.2006). In order to be actionable, the entry on the land of another must not be authorized; … **Trespass to chattel occurs when "there is a "wrongful taking and carrying away of the property of**

**another**."""" *Wint v. Alabama Eye & Tissue Bank*, 675 So. 2d 383, 385 (Ala. 1996)."
(*Tennant v. Chase Home Finance, LLC,* , 187 So. 3d 1172 - Ala: Court of Civil Appeals
2015,)

256.   Defendant's records evidence that in December, Defendant's rekey the locks
on the doors of  Ms. Tipp's house and authorized a 'trash out' of the personal property of
her parents.

257.   On December 2, 2010, Defendant's "... rekeyed ... if we go to **PP eviction** I
believe **we will be on hold for the affidavit issues**"(emp) "... **We will move forward
as a Vacant property**  and ... **remove all remaining items left behind**... **trash out
per evictions** coordinator ..."(emp)

258.   On December 11, 2010, without the right of possession or the right of entry,
Defendant's went onto Plaintiff's property in violation of a court order and signs posted
by Ms. Tipp, and, by forcible entry and trespass, took unlawful possession of Ms. Tipp's
property as part of a continuing pattern of  criminal activity.

259.   On July 7, 2010, Defendant's "stipulated" to the disposal of Ms. Tipp's
property through a "secret agreement" in a pattern and practice of a wrong against Ms.
Tipp's right of possession.

260.   Defendant's have willfully, with malice and forethought, engaged in activity
to bar Ms. Tipp's "right of possession" of her property she had legal title to and legal
possession of.

261.   There is "....[N]o period of limitation at all is applicable to an action for a
declaratory judgment ... in cases involving a continuing harm ... the same constitutes at
least **the equivalent of a <u>continuing invasion of plaintiff's property rights akin
to a continuing trespass</u>** – a situation in which a new cause of action arises in
plaintiff's favor ... each day (id. At 254; *see Dowsey v. Village of Kensington*, 257 N.Y. 221,
228, 177 N.E. 427 [1931])."(emp) (*Breland v. City of Fairhope*, 229 So. 3d 1078 Ala:
Supreme Court 2016)

## PRAYER FOR RELIEF

WHEREFORE,  the property rights of all parties in the 2009 and 2013 cases were adjudicated on the merit in  *Sims v. JPMC Specialty Mortgage, LLC*, 218 So . 3d 376 Ala: Court of Civil Appeals 2016  rendering JPMC's claims "a nullity" and  finding Ms. Sims conveyed her interest in the property to Ms. Tipp in August 2009.

Ms. Tipp's property that she had legal title to and the right of possession was seized and unlawfully detained by defendant's JPMC and CHASE BANK, and then disposed of in a "confidential" settlement agreement between defendant's and Ms. Sims, the predecessor in title, in direct contravention of the courts opinion in *Sims* and prevailing law.  Ms. Tipp, *successor in title*, was not a party to the 2013 state court action respectfully requests that the Court:

A.    Declare Ms. Tipp the lawful owner of the property located at 11101 Ben Hamilton Road, Grand Bay,Alabama,  36541 consistent with the .state court judgment in in  *Sims v. JPMC Specialty Mortgage, LLC*, 218 So . 3d 376 Ala: Court of Civil Appeals 2016.

B.    Declare the foreclosure deed recorded in the probate records on July 30, 2009 void ab initio.

C.    Declare the quit claim deed executed by JPMC on June 19, 2018 in favor of Ms. Sims and recorded on June 30, 2018,  void ab initio.

D    Award compensatory, consequential, exemplary and punitive damages to Ms. Tipp in an amount to be determined.

E.    Grant to Ms. Tipp whatever other relief is just and proper.


Respectfully submitted

*Marian S.A. Tipp*

Marian S.A. Tipp


I declare under penalty of perjury that the foregoing is true and correct.

CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and accurate copy of the foregoing  to be electronically filed with the Clerk of Court for the United States District Court for the Southern District of Alabama using the CM/ECF system.

I further certify that on this date I caused a true and accurate copy of the foregoing to be served on the counsel of record at the email addresses below.

This the __6th__ day of August, 2021.

*Marian S.A. Tipp*
_____
Marian S. A. Tipp


Michael E. Turner, Esq.
PHELPS DUNBAR LLP
2001 Park Place North,
Suite 700
Post Office Box 830612
Birmingham, Alabama 35283
Telephone: 205-716-5200
Facsimile: 205-716-5389
michael.turner@phelps.com


Jason W. Bobo, Esq.
PHELPS DUNBAR LLP
2001 Park Place North,
Suite 700
Post Office Box 830612
Birmingham, Alabama 35283
Telephone: 205-716-5200
Facsimile: 205-716-5389
jason.bobo@phelps.com